

Filed
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM,
Plaintiff-Appellee,

**v.**

## MUKI JOSEPH REDHART CALLAHAN,
Defendant-Appellant.

Supreme Court Case No. CRA21-010
Superior Court Case No. CF0132-12

## OPINION

## Cite as: 2022 Guam 13

Appeal from the Superior Court of Guam
Argued and submitted on June 6, 2022
Via Zoom video conference

Appearing for Defendant-Appellant:
Peter C. Perez, *Esq.*
Law Office of Peter C. Perez
DNA Bldg.
238 Archbishop Flores St., Ste. 802
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Marianne Woloschuk, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr.
Tamuning, GU 96913



E-Received
12/22/2022 1:44:14 PM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**MARAMAN, J.:**

[1]     Defendant-Appellant Muki Joseph Redhart Callahan appeals from his criminal judgment of conviction.  A jury found Callahan guilty of sixteen offenses: seven counts of First Degree Criminal Sexual Conduct (As a First Degree Felony) ("CSC I") and nine counts of Second Degree Criminal Sexual Conduct (As a First Degree Felony) ("CSC II") against minor victims K.R.F. and M.J.T.   On appeal, Callahan assigns error to the sufficiency of evidence, an allegedly non-unanimous verdict by the jury, and the admission of allegedly impermissible hearsay.  We largely affirm the trial court's rulings below.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[2]     Callahan was indicted on the following charges: (1) CSC I, in that he intentionally engaged in sexual penetration with another, to wit: by causing his penis to enter the vagina of K.R.F. (six counts occurring between June 17, 2011, and August 15, 2011); (2) CSC I, in that he intentionally engaged in sexual penetration with another, to wit: by causing his penis to enter the vagina of K.R.F. (one count occurring between August 16, 2011, and February 21, 2012); (3) CSC II, in that he intentionally engaged in sexual contact with another, to wit: by causing his penis to touch the primary genital area of K.R.F. (six counts occurring between June 17, 2011, and August 15, 2011); (4) CSC II, in that he intentionally engaged in sexual contact with another, to wit: by causing his penis to touch the primary genital area of K.R.F. (one count occurring between August 16, 2011, and February 21, 2012); (5) CSC II, in that he intentionally engaged in sexual contact with another, to wit: by causing his finger to touch the anus of M.J.T.; (6) CSC II, in that he intentionally engaged in sexual contact with another, to wit: by causing his hand to touch the penis of M.J.T.

**[3]**     These charges arose from multiple incidents within two discrete time periods—the first from June 17, 2011, to August 15, 2011, and the second from August 16, 2011, to February 23, 2012. This matter had been remanded to the trial court under this court's opinion in *People v. Callahan*, 2018 Guam 17. The retrial took place in May 2021.

**[4]**     During the periods of the incidents charged, Callahan allegedly engaged in criminal sexual conduct against minors K.R.F. and M.J.T. From approximately September 2010 to September 2011, the family was living at a house in Yigo, and for about the next year (September 2011 to September 2012), the family was living on Andersen Air Force Base. K.R.F.'s mother testified that K.R.F. and M.J.T. had experienced behavioral changes after the move to the Andersen house. She testified that, after an inappropriate joke from Callahan, K.R.F. remarked, "Are you talking about S-E-X?", which led the mother to ask K.R.F. if there was anything K.R.F. wished to tell her. Transcript ("Tr.") at 44-46 (Jury Trial, May 12, 2021). Defense counsel objected on hearsay grounds to K.R.F.'s mother recounting her daughter's question asking about "S-E-X." *Id.* at 45. The People countered that the statement was offered to show the state of mind of the witness, not offered for the truth of the matter asserted. The trial court sustained the objection, but it did not give the jury a curative instruction, strike the testimony, or otherwise remediate the testimony.

**[5]**     K.R.F.'s mother also testified that, after talking to K.R.F. following the "S-E-X" comment, K.R.F. said Callahan made her have "S-E-X" with him. *Id.* at 103-04. The mother then had a similar conversation with M.J.T., who alleged to her that Callahan had hurt him and penetrated his buttocks area. The mother then contacted the military police to have Callahan removed from the home and sought medical help for the children, later bringing K.R.F. to Healing Hearts Crisis Center for examination.

[6]  K.R.F. testified that during the 2011-2012 periods, Callahan had intercourse with her, specifically sharing that he put his penis inside her vagina, touched her private parts, and made her perform oral sex and touch his penis with her hand. She also alleged that the assaults had occurred more than ten times, and that they occurred at both houses where they lived on Guam. K.R.F. could not specify an exact number due to her age at the time of the incidents but said it happened often.

[7]  On direct examination, K.R.F. testified:

> Q:  Now you said he hurt you. How did he hurt you?
>
> A:  He threatened me, and he raped me.
>
> Q:  Now when you say he raped you what do you mean by that?
>
> A:  That means like he had intercourse with me and made me like give him oral sex and with my hand.
>
> . . . .
>
> Q:  Okay. When you were seven or eight did you know the word intercourse?
>
> A:  Probably not.
>
> Q:  All right. What do you remember . . . what was happening to you from [Callahan] about 10 years ago?
>
> A:  When we were like alone he would undress me and make me do things I didn't want to.
>
> Q:  And that's where you said he would have sex with you.
>
> A:  Yeah.

Tr. at 137-38 (Jury Trial, May 12, 2021).

[8]  K.R.F. continued:

> Q:  . . . . All right. You testified that [Callahan] would have intercourse with you.

A:      Yes.

Q:      And I want to be clear.  When you say intercourse what are you meaning?

A:      That he put his penis in my vagina and made me do oral sex.

Q:      Okay.  And do you know how often this happened?

A:      I don't know an exact number because I was so young and it's kind of impossible, but it seemed like it happened all the time.

Q:      Okay.  More than once?

A:      Yes.

Q:      More than 10 times?

A:      Yes.

Q:      Okay.  And do you remember did this happen only at the house on base or the house in Yigo?

A:      Both houses.

. . . .

Q:      And so the first time you mentioned this to your mother was after the discussion at the dinner table.

A:      Yes.

Q:      Okay.  How come you never told her earlier than that?

A:      He would threaten me, threaten to kill me.

*Id.* at 142-44.

[9]     On cross-examination, K.R.F. testified:

Q:      Okay.  Now you've indicated earlier that you and [Callahan] had intercourse, correct?

A:      Yes.

Q:      Okay.  Now what is intercourse to you again?

A:    Sex, oral sex.

Q:    Okay.  Now when you mean sex what do you mean by sex?

A:    Putting his penis in my vagina.

Q:    Okay.  So it's vaginal penetration.

A:    Yes.

Q:    Okay.  Now when you testified you -- well how many times did this occur?

A:    I don't remember exactly how many times.

Q:    Okay.  But you said it seems –

A:    I said it seemed like it happened a lot.

Q:    It seemed like it happened a lot.  So it seemed like it happened a lot or it did happen a lot?

A:    It did happen a lot.

Q:    Okay.  So it did happen a lot.  Okay.  Now you indicated that this all came out one night during dinner.

. . . .

Q:    Okay.  Now you're saying that [the sexual abuse] occurred quite a bit for two years.

A:    Yes.

Q:    Okay.  But you never saw a doctor otherwise besides those two or besides that time?  Excuse me.

A:    I don't remember if I saw a doctor or not before.

. . . .

Q:    Okay.  Now you didn't like it when [Callahan] babysat you, did you?

A:    No, I did not.

Q:    Okay.  You wish your mom was home, right?

A:      Yes.

Q:      Okay.  And you liked it when your mom was home.

A:      Yes.

*Id.* at 159-60, 166-67.

**[10]**    On redirect examination, K.R.F. testified:

Q:      You just testified . . . that you did not like it when [Callahan] would babysit.  Why?

A:      Because that's when he would rape me.

*Id.* at 169.

**[11]**    K.R.F.'s mother testified on direct examination:

Q:      When would [Callahan] have a chance to babysit your children?

A:      So he would babysit -- if I went out on a weekend on a Friday or Saturday night, he would babysit.  If I would go running -- I used to run a lot.  I don't run anymore.  I would run half marathons, so I would run every day for like a half hour, hour.  Maybe if I ran to the store, if I had errands and I didn't want to take five children with me, I would leave them with [Callahan].  And I learned that it was happening often, weekly, often.  My children, they felt that it was happening like almost every day in a sense.

Q:      All right.  Let me ask you to back up a little –

A:      Okay.

Q:      -- a little here.  So you would leave [Callahan] as the babysitter on a regular basis.

A:      Yes, yes.

Q:      And you said you ran daily.

A:      Yes.  I ran on average six times a day -- or six times a week because I was training for a marathon.

Q:      Okay.  And at the times you would go out on runs who would be left in charge of the house?

A:      [Callahan] would be left in charge of the house.  He was 16, 17.

*Id.* at 51-52.

[12]    The jury heard further testimony from K.R.F.'s mother, from M.J.T, and from Healing Hearts social worker Valerie Cepeda and sexual assault nurse examiner Ann Paro Rios, who both worked on the case.  Cepeda stated that K.R.F. did say she had been abused but did not elaborate on the extent of the abuse.  Rios corroborated that K.R.F. stated she had been sexually assaulted by Callahan multiple times.

[13]    The jury also heard from Guam Police Department ("GPD") Officer Carl Cruz, the preliminary officer on the case.  At trial, the defense elicited testimony from Cruz that he had received information from military investigators that K.R.F. and M.J.T. had each been abused one time.  But upon redirect, the prosecution refreshed Cruz's memory by showing him his report, at which point Cruz corrected himself, stating that M.J.T. had been abused five times.

[14]    The jury was instructed to reach a unanimous verdict.  In Charge One, counts 1-6, and Charge Two, the jury was specifically instructed to determine whether the People proved beyond a reasonable doubt that Callahan had caused his penis to enter the vagina of K.R.F.  Callahan was convicted on all counts.  For Charge One (counts 1-6), Callahan was sentenced to 35 years' imprisonment; for Charge Two (one count), Callahan was sentenced to 35 years' imprisonment to be served concurrently with his other sentences; Callahan also received a sentence of 15 years' imprisonment for each remaining Charge (Charge Three, including all 6 counts, as well as Charges Four, Five, and Six) to be served concurrently.  Callahan filed a timely notice of appeal from the trial court's final judgment of conviction.

//

//

## II.  JURISDICTION

[15]    This court has jurisdiction over an appeal from a final judgment of conviction under 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-229 (2022)); 7 GCA §§ 3107 and 3108(a) (2005); and 8 GCA § 130.15(a) (2005).

## III.  STANDARD OF REVIEW

[16]    We review *de novo* the legal question first posed to the trial court of whether the evidence was insufficient to support a jury finding of guilt beyond a reasonable doubt.  *People v. Jesus*, 2009 Guam 2 ¶ 19 (citing *People v. Maysho*, 2005 Guam 4 ¶ 6).  "[W]e review the evidence presented at trial in the light most favorable to the People and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *People v. Song*, 2012 Guam 21 ¶ 26.  "This is a 'highly deferential standard of review.'"  *Id.* (quoting *People v. Tenorio*, 2007 Guam 19 ¶ 9).

[17]    We review evidentiary rulings for abuse of discretion and will not reverse absent prejudice affecting the verdict.  *People v. Asprer*, 2019 Guam 19 ¶ 11 (quoting *People v. Hall*, 2004 Guam 12 ¶ 34).  "An 'abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made regarding the admission of evidence.'"  *Id.* (quoting *Hall*, 2004 Guam 12 ¶ 34).  "A non-constitutional error requires reversal unless it is more probable than not that the error did not materially affect the verdict."  *Jesus*, 2009 Guam 2 ¶ 54 (citing *People v. Moses*, 2007 Guam 5 ¶ 18).

## IV.  ANALYSIS

[18]    Callahan argues that the evidence was insufficient to convict him of Charges One to Four, that he was denied his right to a unanimous jury verdict because of the insufficiency of the

evidence, and that the trial court committed a reversible error by admitting multiple alleged hearsay statements without striking the testimony or issuing curative instructions to the jury.

## A. The Evidence Was Sufficient to Convict Callahan of at Least One Count of Each Charge

[19]     A person is guilty of CSC I if he or she engages in sexual penetration with the victim and if another statutory condition is met.  9 GCA § 25.15(a) (2005).  The relevant condition here is when the victim is under fourteen years old.  *Id.* § 25.15(a)(1).  A person is similarly guilty of CSC II if he or she engages in sexual contact with the victim and if any other statutory conditions is met.  9 GCA § 25.20(a) (2005).  The relevant condition here is also when the victim is under fourteen years old.  *Id.* § 25.20(a)(1).

[20]     We will start with a challenge unique to the CSC II charges.  Callahan objects to his convictions under Charges Three and Four by arguing that any physical contact between him and K.R.F. was not for the purpose of sexual arousal or gratification as required by 9 GCA § 25.10(a)(9) (2005) (defining "sexual contact").  Appellant's Am. Br. at 21 (Apr. 4, 2022).  Specific evidence of sexual arousal or gratification is not required.  *See People v. Morales*, 2022 Guam 1 ¶¶ 73-76.  Instead, the "trier of fact may infer motivation based on the defendant's actions."  *Id.* ¶ 75 (quoting *People v. Enriquez*, 2014 Guam 11 ¶ 28).  Callahan argues that K.R.F.'s testimony was "non-specific, vague, inconsistent, and never established that [Callahan] committed all the offense conduct for which the jury convicted him."  Appellant's Reply Br. at 15 (May 23, 2022).  While perhaps not specific on when the incidents occurred, K.R.F. was clear when she testified that Callahan "had intercourse with me and made me like give him oral sex and with my hand."  Tr. at 137 (Jury Trial, May 12, 2021).  She also asserted that Callahan "touched . . . my whole body" including "[m]y vagina, my bottom, my boobs."  *Id.* at 143.  This is plenty of conduct from

which a reasonable jury might infer sexual arousal or gratification by Callahan, and we decline to overturn the jury's findings.

[21] Moving to Callahan's other objections, the jury instructions in the trial below tracked the statutory requirements laid out by 9 GCA §§ 25.15(a) and 25.20(a). The jury instructions for the CSC I counts involving K.R.F. required the jury to find that Callahan: "(1) On or about the period between June 17, 2011 through August 15, 2011, inclusive; (2) In Guam; (3) Did intentionally engage in sexual penetration with another, to wit: by causing his penis to enter the vagina of [K.R.F] . . . a minor under fourteen (14) years of age." *See, e.g.*, RA, tab 316 at 53-58 (Jury Instrs., May 17, 2021). The only difference among the counts for the CSC I charges was that the jury had to find that each count was a separate incident and, for Charge Two, occurred within a separate time range. *See id.* at 53-59. The same is true for the CSC II counts involving K.R.F. They differ from the CSC I counts only in that the former required the jury to find that Callahan "[e]ngage[d] in sexual contact with another, to wit: by causing his penis to touch the primary genital area of [K.R.F] . . . a minor under fourteen (14) years of age." *Id.* at 60-66.

[22] Callahan bases his claim of insufficient evidence on the ability of the jury to unanimously find that the conduct happened in different, discrete incidents. Callahan argues that K.R.F.'s testimony "did not establish specific separate instances as alleged" in the Third Amended Superseding Indictment. Appellant's Am. Br. at 26. Her testimony "was nonspecific." *Id.* The record confirms Callahan's claims. K.R.F. testified that she could not remember the exact number of times she was assaulted; though, she testified that it happened more than ten times. Further still, K.R.F. testified that when she said Callahan would have intercourse with her, that referred to both vaginal penetration and oral sex as well as acts with her hand. This is significant because the jury

instructions for CSC I required a finding that Callahan's penis penetrated her vagina on six separate occasions. Oral sex does not satisfy this requirement.

[23]     We find there is insufficient evidence to support a conviction of multiple counts of CSC I set forth in Charge One. "[T]he testimony of a sexual assault victim does not need to be corroborated, and a victim's testimony alone can support a criminal sexual conduct conviction." *People v. Perez*, 2015 Guam 10 ¶ 36. Thus, the fact that other witnesses could not corroborate the exact number of incidents of penetration does not by itself prevent a finding that multiple incidents of CSC I occurred. Still, K.R.F.'s testimony itself is not specific enough to support a finding of multiple incidents of vaginal penetration. We must therefore vacate Callahan's convictions under counts 2-6 of Charge One of the Third Amended Superseding Indictment.

[24]     At the same time, we affirm Callahan's conviction under count 1 of Charge One. Because K.R.F. testified that both vaginal penetration and oral sex occurred multiple times, a reasonable jury could find that the penetration happened at least once. That K.R.F. could not recall the specific instances of when the vaginal penetration occurred is "immaterial." *See People v. Campbell*, 2006 Guam 14 ¶¶ 27, 32.

[25]     Charge Three yields the same result. Callahan asserts there was insufficient evidence to show "6 specific instances of sexual contact by penis to an unspecified 'primary genital area[].'" Appellant's Am. Br. at 21. As with Charge One, we agree that K.R.F.'s testimony was not specific enough to support a conviction of multiple counts of CSC II for this Charge. But like Charge One, K.R.F.'s testimony reflects at least one instance of sexual contact required by Charge Three. Vaginal penetration is sufficient to prove the sexual contact required here. Thus, we affirm Callan's conviction on Charge Three, count 1 of the Third Amended Superseding Indictment and vacate the rest of the convictions from Charge Three.

[26]     This logic applies to Charges Two and Four as well.  Charges Two and Four allege only a single incident of CSC I and CSC II, respectively.  Charges Two and Four are meant to capture an incident that occurred later to those in Charges One and Three, the former having occurred sometime after K.R.F. had moved from Andersen Air Force Base housing to a house in Yigo.  Callahan only challenges a showing of sufficient evidence for a reasonable jury to find a "separate instance of sexual penetration by penis to vagina" for Charge II and a "separate instance of sexual contact by penis to an unspecified 'primary genital area'" for Charge Four.  Appellant's Am. Br. at 20-21.  K.R.F. testified that vaginal penetration and oral sex occurred at "both houses."  Tr. at 143 (Jury Trial, May 12, 2021).  Thus, a reasonable jury could find there was at least one instance of vaginal penetration at the house on Andersen Air Force Base and at the house in Yigo.  There is sufficient evidence to support a conviction for one count of CSC I and one count of CSC II for Charges Two and Four, and so we affirm those convictions.

[27]     To review, we vacate Callahan's convictions for counts 2-6 under Charge One and counts 2-6 under Charge Three for insufficient evidence.  The evidence was insufficient for a reasonable jury to conclude that sexual penetration or sexual contact as required by the jury instructions occurred on separate instances.  For his remaining convictions under Charges One to Four, the evidence was sufficient for a jury to convict Callahan, and so they are not disturbed.

## B.  Callahan's Jury Unanimity Issue Is Moot

[28]     With the sufficiency issue resolved, we find Callahan's Sixth Amendment argument moot.  Callahan's unanimity issue is predicated on the alleged insufficiency of the evidence.  Callahan argues he was denied his right to a unanimous jury verdict because the trial evidence was of such a "nonspecific quality and was so insufficient in substance and presentation" that it would have been impossible for the jury to unanimously agree on the factual elements underlying the charges.

Appellant's Am. Br. at 32. Callahan argues this denial of his Sixth Amendment rights constituted a structural error requiring reversal. *Id.*

[29]    However, as discussed above, we vacate the convictions for all but one count of Charges One and Three and determine the evidence is sufficient to sustain Callahan's remaining convictions because K.R.F.'s testimony confirmed at least one instance of sexual penetration and sexual contact at each house; this covers Charges One through Four of the Third Amended Superseding Indictment. Thus, there is no longer a specificity problem and, therefore, no legitimate question on the jury's ability to return a unanimous verdict in these circumstances.

[30]    Additionally, there is no jury unanimity issue with respect to Callahan's convictions under Charges Five and Six. Callahan is not clear on why his convictions under these charges should be vacated under this theory. In his opening brief, he argues that "Argument I" shows the evidence was insufficient to allow for a unanimous verdict. Appellant's Am. Br. at 32. However, "Argument I" challenged Callahan's convictions only under Charges One through Four; it did not address Charges Five and Six. *See id.* at 16, 22 n.1. While Callahan claims his statement of facts also shows there was insufficient evidence for a jury to reach a unanimous verdict, that is all he says on the subject; nowhere does he explain with specificity his issue with the jury findings on Charges Five and Six. *See id.* at 32-33. Moreover, Callahan declined to challenge his convictions under Charges Five and Six under an insufficient-evidence theory. *See id.* at 22. Therefore, we see no reason why a jury could not take this sufficient evidence and reach a unanimous guilty verdict.

## C. The Admitted Testimony Did Not Constitute Reversible Error

[31]    Last, Callahan asserts that the trial court committed reversible error when it did not issue a curative instruction or prevent certain inadmissible hearsay from being presented to the jury.

Appellant's Am. Br. at 35, 37. Rule 801 of the Guam Rules of Evidence ("GRE") defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Guam R. Evid. 801(c). Hearsay is generally inadmissible unless an exception applies. *People v. Roten*, 2012 Guam 3 ¶ 16. The objectionable testimony identified by Callahan falls into three categories: (1) testimony of the victims' mother recounting statements told to her by the victims about their alleged assaults; (2) separate testimony of the victims' mother where she recounted a question posed by K.R.F. where the child asked, "Are you talking about S-E-X?"; and (3) testimony from Officer Cruz where he recounted that M.J.T. told him he had been abused five times. Appellant's Am. Br. at 37-40. Each of these shall be addressed in turn.

#### 1. The victims' mother's testimony on the abuse of her children was cumulative and therefore harmless

[32]    Plaintiff-Appellee People of Guam ("People") do not dispute Callahan's assertion that the victims' mother's statements recounting what her children told her about Callahan's actions qualify as hearsay. *See* Appellee's Br. at 22-23 (May 9, 2022). Nor do the People argue this testimony falls into the exceptions to hearsay. *See id.* We therefore take it as given that the victims' mother's statements here were inadmissible hearsay and should not have been offered to the jury, and that a curative instruction should have been given to the jury to disregard her inadmissible testimony.

[33]    But we have held that evidentiary rulings of the trial court will not be reversed absent prejudice affecting the verdict. *Asprer*, 2019 Guam 19 ¶ 11 (quoting *Hall*, 2004 Guam 12 ¶ 34). Thus, if these errors are found to be non-prejudicial, then reversal is not warranted. Reversal is not required for a non-constitutional error if "it is more probable than not that the error did not materially affect the verdict." *Jesus*, 2009 Guam 2 ¶ 54 (citing *Moses*, 2007 Guam 5 ¶ 18).

Generally, if a part of the testimony was inadmissible but was merely cumulative to other legitimate testimony, then any error is harmless. *See Roten*, 2012 Guam 3 ¶ 43; *Jesus*, 2009 Guam 2 ¶ 55.

[34]    We find that the victims' mother's testimony on this point was cumulative of admissible testimony given by the victims themselves, and so any error here was harmless. Both M.J.T. and K.R.F. testified about the abuse they suffered at the hands of Callahan. The victims' mother's inadmissible hearsay testimony was merely repetitious of what was said by her children. Callahan argues that the victims' mother's testimony was not cumulative because it was specific, she recalled more precise dates and number of instances, while the victims' testimony was more vague. *See* Reply Br. at 22-26. This point misses the mark. As the People correctly note, time is not an element of either CSC I or II. Appellee's Br. at 15; *Campbell*, 2006 Guam 14 ¶ 17. All that is required is enough evidence for the jury to find the acts occurred at "a date reasonably near the date alleged in the indictment." *Campbell*, 2006 Guam 14 ¶ 17. This is especially true since we vacated all of Callahan's convictions under Charges One and Three of the indictment except for the first count under those respective charges. Thus, the jury needed evidence of only one instance of CSC I and CSC II to match those convictions. The victims' mother's testimony was cumulative to that offered by K.R.F. on this point, and the error in failing to issue a curative instruction was harmless.

### 2.  The victims' mother's remaining testimony was not hearsay

[35]    The People do dispute whether it was hearsay when the victims' mother testified that in response to an inappropriate joke made by Callahan, K.R.F. responded, "Are you talking about S-E-X?" *See* Appellee's Br. at 23-24. Though the trial court sustained Callahan's objection here, we find this testimony was not hearsay and therefore admissible.

**[36]** "'Hearsay' is a *statement*, other than one made by the declarant while testifying . . . , offered in evidence to *prove the truth of the matter* asserted." Guam R. Evid. 801(c) (emphases added). A statement is defined as "an oral or written *assertion*." Guam R. Evid. 801(a)(1) (emphasis added). Thus, for testimony to qualify as hearsay, it must be: (1) an assertion; and (2) offered to prove the truth of the matter being asserted. The victims' mother's testimony does not meet either requirement.

**[37]** Looking to the Federal Rules of Evidence, on which GRE 801 and 803 were based, questions are generally not considered hearsay. *See United States v. Love*, 706 F.3d 832, 840 (7th Cir. 2013) (collecting cases). This present case shows why. The question "Are you talking about S-E-X?" is not asserting anything; it is not setting forth a proposition. Instead, the question is a mere request for information. Since this question is not an assertion, it is not a statement for purposes of hearsay.[1] Because it does not meet the definition of hearsay, it was admissible.

**[38]** Even if the question here is an assertion, it was not offered to prove the truth of the matter asserted. The People argue that the statement was offered to prove the effect it had on the victims' mother. Appellee's Br. at 24. Callahan does not offer an alternative theory for what this statement was trying to prove. We agree with the People that it was immaterial whether Callahan was talking about sex. Instead, the purpose of introducing this question was to explain why the victims' mother then had private conversations with her children about Callahan. As the question was not used to prove any matter asserted, it cannot qualify as hearsay, and the lack of a curative instruction was not error.

---

[1] This is not to suggest that a question can *never* be hearsay. The key inquiry is whether there was assertive intent. *See, e.g.*, *United States v. Summers*, 414 F.3d 1287, 1298-1300 (10th Cir. 2005) (holding the question to police "How did you guys find us so fast?" to "intimate[] both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so quickly" and so qualifies as hearsay).

### 3. Callahan opened the door to Officer Cruz's testimony, so it was not inadmissible hearsay

[39]    Finally, we find no reversible error with Officer Cruz's testimony. Again, the People do not dispute the characterization of this part of Officer Cruz's testimony as hearsay. Appellee's Br. at 24-26. We will assume the testimony was hearsay and should not have been admitted if offered in isolation.

[40]    The People argue that Callahan's counsel opened the door to this testimony based on the cross-examination of Officer Cruz. Callahan's trial counsel asked Cruz about the number of alleged CSC incidents M.J.T. reported to have occurred, to which Cruz answered: "Once . . . ." Tr. at 14 (Jury Trial, May 13, 2021). On redirect, the prosecution refreshed Cruz's recollection by asking him to look at his report for M.J.T. to check how many times M.J.T. said he had been abused. *Id.* at 18. After refreshing his memory, Cruz stated, "I stand corrected. . . . It would be five." *Id.*

[41]    Otherwise inadmissible testimony may be admitted when "opposing counsel opens the door for the evidence by creating a misleading impression about its contents or significance." *Morales*, 2022 Guam 1 ¶ 58. "[W]hen a criminal defendant creates a false or misleading impression on an issue, [courts] have held the government may 'clarify, rebut, or complete [the] issue' with what would 'otherwise [be] inadmissible evidence, including hearsay statements.'" *Id.* (second, third, and fourth alterations in original) (quoting *United States v. Spotted Bear*, 920 F.3d 1199, 1201 (8th Cir. 2019)). Still, there are limits on this doctrine; "[t]he admitted evidence must put the misleading evidence or testimony into context and may generally not 'stray beyond the scope of the invitation.'" *Id.* at 59 (quoting *Wells v. State*, 319 S.W.3d 82, 94 (Tex. App. 2010)).

[42]    This exchange falls squarely within our "open door" doctrine. The defense counsel first asked Officer Cruz to report how many times the victims said they were abused. The People then

asked—without objection—for Officer Cruz to refresh his memory by reading his report to verify how many times M.J.T. said he had been abused. This "remedy [was] proportionate to the malady." *Morales*, 2022 Guam 1 ¶ 59 (quoting *State v. Heath*, 211 A.3d 458, 463 (Md. 2019)). Here, the People merely had Officer Cruz refresh his memory to accurately answer a question first posed by defense counsel. Though it may have been hearsay, this testimony was first solicited by defense counsel, who opened the door to the prosecution to correct the record.

[43]    In sum, none of Callahan's arguments on hearsay warrant reversing his convictions. The victims' mother's inadmissible testimony was merely cumulative to what was reported by the victims themselves. The victims' mother's testimony about K.R.F. asking "Are you talking about S-E-X?" did not meet the definition of hearsay. Finally, defense counsel opened the door to any hearsay testimony given by Officer Cruz. Thus, we find no reversible errors in the testimony at trial.[2]

## V.  CONCLUSION

[44]    The evidence was insufficient to sustain convictions of multiple incidents of CSC I and CSC II involving K.R.F. at the Yigo house. Thus, Callahan's convictions for counts 2-6 of Charge One and counts 2-6 of Charge Three must be vacated. However, the evidence was sufficient for a rational jury to convict Callahan for one incident of CSC I and CSC II at each house where the victims lived. With the reversal of the convictions under counts 2-6 of Charges One and Three, the sufficiency for a unanimous jury verdict is met, and we deny Callahan's Sixth Amendment

---

[2] Callahan also raises, for the first time on appeal, another argument that neither the victims' mother nor Officer Cruz were competent to testify about the abuse suffered by the victims since they lacked firsthand knowledge. Appellant's Am. Br. at 40 (Apr. 4, 2022). This objection was not raised at trial, and so plain error review applies. *See People v. Morales*, 2022 Guam 1 ¶ 9. To succeed on plain error review, a defendant must show, *inter alia*, a violation of substantial rights. *People v. Gargarita*, 2015 Guam 28 ¶ 11. The victims' mother's and Officer Cruz's testimony was merely cumulative to testimony from the victims themselves, and so there is no harm there. *See People v. Martin*, 2018 Guam 7 ¶ 59. As for K.R.F.'s question recounted by the victims' mother, the mother was present when the question was asked, and the question was used for its effects on her, the listener. Accordingly, there is no harm here either, and no further review of this argument is necessary.

claim. We also find that the alleged hearsay statements are either harmless or not hearsay, and they do not constitute reversible error. We **REVERSE** the judgment in part, vacating the convictions for counts 2-6 of Charges One and Three. We **AFFIRM** the remaining convictions and **REMAND** for re-sentencing consistent with this opinion.


| /s/ | | /s/ |
| --- | --- | --- |
| ROBERT J. TORRES | | KATHERINE A. MARAMAN |
| Associate Justice | | Associate Justice |

/s/
F. PHILIP CARBULLIDO
Chief Justice